## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| SUPERIOR INTEGRATED SOLUTIONS, INC., | ) | CASE NO. 3:09-CV-314 |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Rose |
| | ) | |
| THE REYNOLDS AND REYNOLDS COMPANY | ) | |
| | ) | Magistrate Judge Sharon L. |
| | ) | Ovington |
| Defendant. | ) | |
| | ) | |

## DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS FILED SUBJECT TO ITS PARTIAL MOTION TO DISMISS

Defendant The Reynolds and Reynolds Company ("Defendant" or "Reynolds"), by and through its attorneys of record, files this Original Answer to Plaintiff Superior Integrated Solutions, Inc.'s ("Plaintiff" or "SIS") Complaint and Jury Demand:

### NATURE OF THIS ACTION

1.     This is an action for declaratory judgment, injunctive relief, breach of contract, tortious interference with business relationships, tortious interference with contract, and unfair or deceptive trade practices, under, among other provisions, 28 U.S.C. §§ 2201(a), 2202, and Fed. R. Civ. P. 57 and 65. Plaintiff SIS seeks:

a.     a declaration of the rights and obligations of the parties under the Reynolds Interface Agreement (the "RIA) dated September 21, 2006, attached as Exhibit A, particularly Reynolds' obligation to adhere to a reasonable wind-down period after the expiration

of the RIA, and its obligation to return certain proprietary information that SIS provided during the term of the RIA;

> b.    a preliminary and permanent injunction:
>
> > • prohibiting Reynolds from removing, disabling, and/or otherwise interfering with the interfacing between SIS's integration software and the Reynolds dealer management systems at over 3,000 auto dealerships across the country, including approximately 130 dealerships in Ohio, without implementing a reasonable wind-down period; and
> >
> > • requiring Reynolds to return certain proprietary information regarding SIS's customers that SIS provided to Reynolds during recent negotiations toward a new Reynolds interface agreement, and requiring Reynolds to confirm in writing that it has not retained this proprietary information in any form;
>
> c.    direct and consequential damages against Reynolds for its breaches of the

RIA; and

> d.    direct, consequential, and punitive damages against Reynolds for its

tortious interference with SIS's business relationships and contracts with SIS's direct customers and auto dealers, and for Reynolds' unfair or deceptive trade practices.

**Answer:**    Paragraph 1 contains no allegations of fact to admit or deny. To the extent a response is required, this paragraph is denied.

## PARTIES

2.    Plaintiff SIS is a corporation organized and existing under the laws of New Jersey. Its principal place of business is located in Edison, New Jersey.

**Answer:**    Reynolds admits the allegations in Paragraph 2.

3.    Defendant Reynolds is an Ohio corporation with its principal place of business in Kettering, Ohio.

**Answer:**    Reynolds admits the allegations in Paragraph 3.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because SIS and Reynolds are citizens of different states, and the amount in controversy, exclusive of interest, costs, and attorney's fees, exceeds $75,000.

**Answer:**     Reynolds admits the allegations in Paragraph 4.

5.     This Court has personal jurisdiction over Reynolds because Reynolds is an Ohio corporation with its principal place of business in Kettering, Ohio, and because Reynolds, at all relevant times, has transacted business in Ohio.

**Answer:**     Reynolds admits the allegations in Paragraph 5.

6.     This Court also has personal jurisdiction over Reynolds because Reynolds has contractually agreed to submit to the jurisdiction of any federal court in the State of Ohio. *See* RIA, § VI.10.

**Answer:**     Reynolds admits jurisdiction is proper in this Court.   The referenced contract speaks for itself.  To the extent further response is required, the remainder of this paragraph is denied.

7.     Venue is proper in this Court under 28 U.S.C. § 1391 because Reynolds, at all relevant times, has maintained its principal place of business in Kettering, Ohio, and because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

**Answer:**     Reynolds admits that venue is proper in this Court. To the extent a further response is required, the remainder of this paragraph is denied.

8.     Venue also is proper in this Court because Reynolds has contractually agreed to submit to the jurisdiction of any federal court in the State of Ohio. *See* RIA, § VI.10.

**Answer:**    Reynolds admits that venue is proper in this Court.   The referenced contract speaks for itself.  To the extent a further response is required, any remainder of this paragraph is denied.

## FACTUAL BACKGROUND

### SIS's and Reynolds' Business Relationship

9.    Reynolds is the largest provider of dealer management systems ("DMS") to auto dealers throughout the country, occupying more than 60% of the market.

**Answer:**    Reynolds admits that it is a provider of dealer management systems to auto retailers throughout the United States.  The remaining allegations set forth in Paragraph 9 are denied.

10.    DMS allow auto dealers to efficiently organize and utilize numerous types of information necessary to operate their businesses, such as customer information, inventory information (*e.g.*, vehicles and parts), and finance and insurance information (*e.g.*, extended warranty information).

**Answer:**    Reynolds admits that some DMS systems allow auto dealers to efficiently organize and utilize information such as customer information, inventory information, and finance and insurance information.  To the extent a further response is required, any remainder of this paragraph is denied.

11.    Various companies, sometimes referred to as third-party application providers, sell software and other technology products that serve as enhancements to DMS, including Reynolds' DMS.

**Answer:**    Reynolds admits the allegations in Paragraph 11.

12.   These products require integration with Reynolds' DMS in order to function in an optimal fashion.

**Answer:**   Reynolds admits that some such products may be integrated with DMS systems like Reynolds' DMS.   To the extent a further response is required, any remainder of this paragraph is denied.

13.   SIS develops and provides integration software that allows for this needed integration.

**Answer:**   Reynolds admits that SIS has developed an integration tool known as the SIS eData Product.  Reynolds denies the remaining allegations set forth in Paragraph 13.

14.   On September 21, 2006, SIS and Reynolds entered into the RIA.

**Answer:**   Reynolds admits the allegations in Paragraph 14.

15.   Under the RIA, SIS has operated as a member of the Reynolds Certified Interface ("RCI") program, and thus, as a Reynolds-certified integration provider, since September 21, 2006.

**Answer:**   Reynolds admits, beginning on September 21, 2006, Exhibit E to the RIA permitted SIS to hold itself out as certified for the purpose of the Reynolds Certified Interface Program pending the development of certain Interfaced Products contemplated by the RIA, the actual certification of those Interfaced Products, and the migration of those Interfaced Products from the SIS eData Product to an Interface to be created by Reynolds.  Reynolds denies the remaining allegations set forth in Paragraph 15, and specifically denies that Reynolds certified the SIS eData Product for any purpose.

16.   Although a company such as SIS is not required to be certified under the RCI program in order to provide integration with Reynolds' DMS, certification in the program

provides certain benefits, including placement on Reynolds' website, and a corresponding comfort level among auto dealers who use Reynolds' DMS, *i.e.*, over 60% of dealers nationwide.

**Answer:**      Reynolds admits that certification can provide benefits including placement on Reynolds' website.  Reynolds is without sufficient information to admit or deny the response of automotive dealers to certification, and denies that auto dealers who use Reynolds' DMS constitute more than 60 percent of dealers nationwide.  To the extent not specifically admitted herein, Paragraph 16 is denied.

17.      The RCI program also provides benefits to Reynolds, including but not limited to the ability to charge fees for certification.  Give that the RIA with SIS incepted toward the beginning of the RCI program, the RIA has provided particular benefits to Reynolds, which has been able to leverage SIS's willingness to participate in the RCI program to market the program.

**Answer:**      Reynolds admits that RCI certification provides Reynolds an ability to charge fees under its agreements with certified companies, and that SIS's certification would have been contingent upon the parties agreement to and SIS's payment of certain fees.  Reynolds denies the remainder of the allegations set forth in Paragraph 17, and specifically denies that SIS was certified under the RCI Program for purposes of the RIA, and that SIS ever paid any fees or provided any other benefits to Reynolds under the RIA.  To the extent not specifically admitted herein, Paragraph 17 is denied.

18.      The RIA is set to expire on September 21, 2009.

**Answer:**      Reynolds admits the allegation in Paragraph 18.

19.      Since it became certified, SIS has installed, on Reynolds' DMS, certified integration software on behalf of 21 third-party application providers who, in turn, service thousands of auto dealerships, including approximately 130 dealerships in Ohio.

**Answer:**      Reynolds denies that it ever certified any SIS integration software.  Reynolds lacks sufficient information to admit or deny the allegations set forth in Paragraph 19.  To the extent not specifically admitted herein, Paragraph 19 is denied.

**Reynolds' Existing and Planned Additional Breaches of the RIA**

20.     In early 2009, Reynolds and SIS began negotiations toward a new Reynolds interface agreement ("new RIA"), to become effective September 22, 2009.

**Answer:**      Reynolds admits Reynolds and SIS began negotiations toward a new RIA in early 2009.  To the extent not specifically admitted herein, Paragraph 20 is denied.

21.     During the initial phases of the negotiations, Reynolds proposed an initial set of prices for continuing SIS's certification under the new RIA.

**Answer:**      Reynolds denies the allegations of Paragraph 21.

22.     Then, in March 2009, in a complete and sudden turnabout, Reynolds materially changed the financial terms of the new RIA by increasing the proposed pricing exponentially.  *See* letter dated March 27, 2009, from counsel for SIS to R. Schaefer of Reynolds, attached as Exhibit B.

**Answer:**      Reynolds admits that it provided a non-binding proposal of initial prices to SIS for a new RIA in March 2009.  Reynolds denies the remaining allegations set forth in paragraph 22.

23.     Reynolds also tried to unilaterally impose a March 31, 2009 deadline for executing the new RIA, threatened to prematurely terminate the RIA, and informed auto dealers that it would block or remove SIS's integration software, *i.e.*, SIS's intellectual property, from the dealers' Reynolds DMS beginning on April 2, 2009.  *See* Exhibit B.

**Answer:** Reynolds admits initially suggesting a March 31, 2009 deadline for concluding negotiations.  Reynolds also admits that in a single unauthorized incident, a Reynolds salesperson mis-communicated to one dealer that Reynolds would block an SIS-enabled product, (MenuVantage).  When brought to the attention of Reynolds Data Services, the customer was contacted within hours and the situation was rectified.  Reynolds denies all other allegations set forth in paragraph 23.

      24.    Although SIS was able to convince Reynolds to refrain from breaching the RIA by blocking or removing SIS's integration software in April 2009, SIS ultimately was unable to convince Reynolds to reconsider its unreasonable cost-prohibitive, and anti-competitive pricing proposals for the new RIA.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 24.

      25.    In late June 2009, Reynolds confirmed that it would not enter into a new RIA.

**Answer:**      Reynolds admits that it advised SIS that it considered the parties' negotiations towards a new RIA to be concluded on June 22, 2009 after SIS failed to respond to Reynolds' previous offer.  The remaining allegations set forth in Paragraph 25 are denied.

      26.    In late June 2009 and early July 2009, Reynolds also informed SIS that, effective September 21, 2009, Reynolds will remove, disable, or otherwise interfere with the interfacing between SIS's integration software and the Reynolds DMS at approximately 4,000 dealerships across the country, without implementing and adhering to a reasonable wind-down period to occur after September 21, 2009. *See* letter dated June 22, 2009, from R. Schaefer of Reynolds to P. Battista of SIS, attached as Exhibit C, and letter dated July 6, 2009, from R. Schaefer to P. Battista, attached as Exhibit D.

**Answer:**     Reynolds admits that, on June 22, 2009, it advised SIS that it would remove and/or disable interfacing between SIS and Reynolds' ERA dealership customers upon the expiration of the RIA on September 21, 2009. Reynolds is without sufficient information to admit or deny the number of dealerships across the country utilizing SIS integration software. Reynolds denies all remaining allegations set forth in Paragraph 26, and specifically denies that SIS has any right to an additional "wind-down" period after September 21, 2009.

27.     In a June 22, 2009 letter, Reynolds informed SIS that, on September 21, 2009, Reynolds will "remove/destroy all [SIS] directories and files from existing … dealership and hosted systems, customer lists and counts provided to Reynolds from [SIS}, technical information, source code and zar files." *See* Exhibit C.

**Answer:**     Reynolds admits the quoted language set forth in Paragraph 27 reflects a partial quote from a June 22, 2009 letter from Reynolds to SIS. To the extent a further response is required, any remainder of this paragraph is denied.

28.     On July 7, 2009, SIS informed Reynolds that if Reynolds carries out its plan to instantly remove, disable, or otherwise block the interfacing between SIS's integration software and Reynolds' dealerships as described above, such action would constitute a violation of the RIA. *See* cover email and letter dated July 7, 2009, from P. Battista of SIS to R. Schaefer of Reynolds, attached as Exhibit E.

**Answer:**     Reynolds admits that language to this effect was included in the referenced email and letter. To the extent a further response is required, the remainder of this paragraph is denied.

29.     Among other things, SIS reminded Reynolds that section V(g) of the RIA provides that even when the RIA terminates, "Qualified End Users [*i.e.*, dealers] will have the right to continue after this Agreement expires or is terminated to use the Interface in accordance

with previously granted End User License Agreements…." *See* Exhibit E; *see also* Exhibit A. Thus, although SIS cannot add new customers after the RIA terminates on September 21, 2009, Reynolds must permit SIS to provide data to its customers, *i.e.*, third-party application providers, so that those customers can honor their contractual commitments to the existing "Qualified End Users," *i.e.*, their existing auto dealer customers. *See* Exhibits A and E.

**Answer:**      Reynolds admits that SIS has taken the position that section V(g) of the RIA gives automotive dealerships a right to continued use of the "Interface" to integrate software onto the Reynolds DMS after the RIA expires on September 21, 2009.  Reynolds denies all remaining allegations set forth in Paragraph 29, and specifically denies that the quotation of the RIA as modified by SIS accurately describes the referenced RIA section or provides any right for SIS to integrate applications to the DMS using the SIS eData Product after September 21, 2009.

30.      SIS further informed Reynolds that such action also would constitute a tortious interference with SIS's proprietary rights in its integration software and with its business and contractual relationships with its immediate customers and its ultimate end-users, namely auto dealers. *See* Exhibit E.

**Answer**:      Reynolds admits that SIS has taken the position set forth in this paragraph. Reynolds denies the remaining allegations set forth in Paragraph 30.

31.      SIS proposed that the parties instead agree to a reasonable wind-down period, which, among other things, would prevent the expiration of the RIA from unnecessarily and unreasonably interfering with the business operations of over 3,000 auto dealers nationally, including approximately 130 auto dealers in Ohio, who rely on SIS-provided integration to ensure that purchased third-party applications function properly with their DMS. *See* Exhibit E.

**Answer:**     Reynolds admits that SIS proposed that the parties agree to an additional "wind-down" period following the September 21, 2009 expiration of the RIA. Reynolds is without sufficient information to admit or deny the number of auto dealers who receive integration services from SIS. Reynolds denies all remaining allegations set forth in Paragraph 31.

32.     Specifically, SIS proposed that SIS provide Reynolds with an interface termination date for each dealer based on that dealer's individual contract—*i.e.*, "End User License Agreement"—with the pertinent third-party application provider. *See* Exhibit E.

**Answer:**     Reynolds admits SIS generally proposed an additional "wind down" period based on dealers' individual contracts. Reynolds specifically denies that SIS ever provided termination dates or any other specific information about those contracts. Reynolds denies any remaining allegations set forth in Paragraph 32.

33.     In mid-July 2009, in response to SIS's July 7, 2009 communication, Reynolds initially acquiesced to the request for a reasonable wind-down period. *See* email dated July 14, 2009, from P. Battista of SIS to E. Thornhill and R. Schaefer of Reynolds, and email dated July 15, 2009, from E. Thornhill to P. Battista, collectively attached as Exhibit F; *see also* cover email and attached letter both dated July 16, 2009, from P. Battista to R. Schaefer and E. Thornhill, collectively attached as Exhibit G.

**Answer:**     Reynolds admits it advised SIS that, while it was not contractually bound to provide a "wind down" period, it was willing to consider a proposal by SIS for an additional wind-down period, but SIS did not provide specific information or a specific proposal to consider. Reynolds denies the remaining allegations set forth in Paragraph 33.

34.     Approximately two weeks, however, in another sudden and complete turnaround, Reynolds advised SIS that it had changed its mind and that it would proceed to remove and/or

disable the interfacing between SIS software and Reynolds' DMS on September 21, 2009. *See* email dated August 5, 2009, from P. Battista of SIS to R. Schaefer of Reynolds, and email dated August 6, 2009, from E. Thornhill of Reynolds to P. Battista, collectively attached as Exhibit H.

**Answer:**      Reynolds admits that it advised SIS that it would not agree to an additional "wind-down" period after the expiration of the RIA. Reynolds denies the remaining allegations set forth in Paragraph 34.

35.      Since that turnabout, Reynolds also has already begun blocking or otherwise interfering with the interface between SIS's integration software and the DMS used by Reynolds' dealers. *See* email dated August 6, 2009, from P. Battista of SIS to E. Thornhill of Reynolds, attached as Exhibit I.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 35.

36.      Reynolds has taken this action even though the RIA does not expire until September 21, 2009, and even though Reynolds has committed in writing that it will not interfere with the interfacing before the expiration of the RIA on September 21, 2009. *See* Exhibit C.

**Answer:**      Reynolds admits that the RIA does not expire until September 21, 2009, and that it has committed in writing that it will honor its contractual commitments under the RIA through September 21, 2009. Reynolds denies all remaining allegations set forth in Paragraph 36.

37.      Reynolds also has taken this action against SIS, a certified member of Reynolds' RCI program, even though Reynolds simultaneously is taking specific measures to allow other integration providers, who are not even RCI members, to continue their interfacing with Reynolds' DMS. *See* Exhibit I.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 37.

**Reynolds' Unauthorized Retention of SIS's Proprietary Information**

38.     During the initial phases of negotiations over the new RIA, SIS negotiated in good faith by, among other things, providing information to Reynolds regarding SIS's third-party application provider customers.

**Answer:**     Reynolds is without sufficient information to admit or deny whether SIS negotiated in good faith over a new RIA.  Reynolds admits the remaining allegations set forth in Paragraph 38.

39.     When negotiations broke down, SIS demanded that Reynolds return this proprietary information. *See* Exhibit E.

**Answer:**     Reynolds admits that SIS demanded that Reynolds either return or destroy information that it claimed to be proprietary.

40.     As with the discussions regarding a potential wind-down period for the interfacing between SIS and Reynolds' dealers, Reynolds initially agreed to destroy this proprietary information and to provide written confirmation of that destruction to SIS.  *See* Exhibits F and G.

**Answer:**     Reynolds admits that it agreed to destroy certain information that SIS claimed as its proprietary information, but denies it had any duty to do so.  Reynolds denies the remaining allegations set forth in Paragraph 40.

41.     Reynolds, however, still has not provided confirmation that it has destroyed SIS's referenced proprietary information, and Reynolds has not returned that information either.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 41.

42.    Moreover, since it changed its mind regarding the interface wind-down, Reynolds has not given SIS any assurances that Reynolds at least will still follow through on its commitment to either return or destroy SIS's proprietary information.

**Answer:**    Reynolds denies the allegations set forth in Paragraph 42.

43.    At this point, SIS cannot trust that Reynolds will destroy the information, and thus seeks a mandatory preliminary injunction compelling Reynolds to return the proprietary information and at the same time provide written confirmation that it retains no records whatsoever of any of the proprietary information.

**Answer:**    Reynolds denies the allegations set forth in Paragraph 43.

## COUNT I
### (Declaratory Judgment)

44.    Plaintiff SIS realleges and incorporates by reference herein each allegation contained above.

**Answer:**    Reynolds repeats and incorporates by reference herein its responses to each allegation of fact set forth above.

45.    Under section V(g) of the RIA, Reynolds is obligated to allow "Qualified End Users [*i.e.*, dealers] … to continue after this Agreement expires or is terminated to use the Interface in accordance with previously granted End User License Agreements…." *See* Exhibit A.

**Answer:**    Reynolds admits that SIS has transcribed certain language appearing in the RIA in Paragraph 45 but denies that its modified quotation of that section accurately sets forth that section. The RIA speaks for itself. Reynolds denies the remaining allegations set forth in Paragraph 45, and specifically denies that the Interface was ever defined, developed, tested,

released, or certified under the RIA, and further denies that the RIA provides SIS with any rights to continue using the RCI Gateway following the September 21, 2009 RIA termination date.

46.      Reynolds has refused to agree to such a wind-down period after the expiration of the RIA.  Instead, Reynolds insists that it is permitted, at any time on or after September 21, 2009, to unilaterally remove, disable, and/or otherwise interfere with the interface between SIS's integration software and the DMS used by Reynolds' dealers.

**Answer:**      Reynolds admits that it does not agree to an additional "wind-down" period after the expiration of the RIA and that Reynolds has the right not to renew the existing RIA as communicated to SIS in the January 19˙2009 letter.  To the extent a further response is required, any remainder of this paragraph is denied.

47.      Without any explanation, Reynolds also has already begun blocking or otherwise interfering with the interface between SIS's integration software and the DMS used by Reynolds' dealers, even though the RIA does not expire until September 21, 2009.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 47.

48.      Reynolds also is required to return SIS's proprietary customer information, but Reynolds, to date, has failed to do so, and has not given any assurances that it will do so since reneging on its earlier commitment to a wind-down period.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 48.

49.      An actual and justiciable controversy exists between SIS and Reynolds regarding the parties' rights and obligations under the RIA, particularly as it pertains to the issue of a wind-down period and the return of SIS's proprietary information.

**Answer:**      Paragraph 49 contains no allegations of fact.  To the extent a response is required, Reynolds denies the allegations set forth in Paragraph 49.

50.     A judicial determination is necessary at this time so the parties' dispute may be resolved and that the parties may be aware of their respective rights and duties.

**Answer:**     Paragraph 50 contains no allegations of fact.    To the extent a response is required, Reynolds denies the allegations set forth in Paragraph 50.

51.     SIS is entitled to a declaration of the rights and obligations of the parties under the RIA.

**Answer:**     Paragraph 51 contains no allegations of fact.  To the extent a response is required; Reynolds denies the allegations set forth in Paragraph 51.

## COUNT II
### (Injunctive Relief)

52.     Plaintiff SIS realleges and incorporates by reference herein each allegation contained above.

**Answer:**     Reynolds repeats and incorporates by reference herein its responses to each allegation of fact set forth above.

53.     Reynolds' existing and planned future interference with the interfacing between SIS's integration software and the DMS used by Reynolds' dealers, if not quickly enjoined, will inflict irreparable injury, loss, or damage on SIS, by eliminating a very substantial portion of SIS's business revenue.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 53.

54.     Reynolds' failure and apparent refusal to return SIS's proprietary information, which relates to each SIS customer's technology, also is putting SIS at significant risk of irreparable injury because it will permit Reynolds to use this proprietary information to compete illegally with SIS. Specifically, this information would ally Reynolds to solicit SIS's customers

more easily, by allowing Reynolds to create interfaces for those customers much more quickly than if Reynolds had to learn each customer's systems independently.

**Answer:**        Reynolds denies the allegations set forth in Paragraph 54.

55.        Adhering to a reasonable wind-down period and returning SIS's proprietary customer information will not adversely affect Reynolds' legitimate business interests.

**Answer:**        Reynolds denies the allegations set forth in Paragraph 55.

56.        SIS has no adequate remedy at law for Reynolds' wrongful conduct.

**Answer:**        Paragraph 56 contains no allegations of fact.  To the extent a response is required, Reynolds denies the allegations set forth in Paragraph 56.

57.        SIS is entitled to a preliminary and permanent injunction prohibiting Reynolds from removing, disabling, or otherwise interfering with the interfacing between SIS's integration software and the DSM used by Reynolds' dealers.

**Answer:**        Paragraph 57 contains no allegations of fact.  To the extent a response is required, Reynolds denies the allegations set forth in Paragraph 57.

58.        SIS is entitled to a preliminary and permanent injunction requiring Reynolds to return SIS's proprietary information discussed above, and requiring Reynolds to confirm in writing that is has not retained any of that proprietary information in any form.

**Answer:**        Paragraph 58 contains no allegations of fact.  To the extent a response is required, Reynolds denies the allegations set forth in Paragraph 58.

**COUNT III**
**(Breach of Contract)**

59.        Plaintiff SIS realleges and incorporates by reference herein each allegation contained above.

**Answer:**      Reynolds repeats and incorporates by reference herein its responses to each allegation of fact set forth above.

60.      Reynolds has breached the RIA by already beginning to block and/or otherwise interfere with the interface between SIS's integration software and the DMS used by Reynolds' dealers.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 60.

61.      Reynolds also has made clear its intention to completely block and/or otherwise interfere with the interface between SIS's integration software and the DMS used by Reynolds' dealers, effective September 21, 2009.

**Answer:**      Reynolds admits the RIA terminates on September 21, 2009 including expiration of SIS's right to use the RCI Gateway after the expiration of the RIA.  To the extent a further response is required, any remainder of this paragraph is denied.

62.      As a direct and proximate result of Reynolds' breaches of its contractual obligations, SIS has suffered, and will continue to suffer, direct and consequential damages, including lost revenue and damage to its goodwill and business reputation among its direct customers and auto dealers.

**Answer:**      Reynolds denies the allegations set forth in Paragraph 62.

<u>COUNT IV</u>
**(Tortious Interference with Business Relationships)**

63.      Plaintiff SIS realleges and incorporates by reference herein each allegation contained above.

**Answer:**      Reynolds repeats and incorporates by reference herein its responses to each allegation of fact set forth above.

64.     SIS has and had pre-existing and prospective business relationships, both with its direct customers, namely third-party application providers, and with thousands of auto dealers around the country.   These relationships relate to and depend on, among other things, SIS's ability to integrate third-party applications with auto dealers' DMS.

**Answer:**     Reynolds is without sufficient information to admit or deny the allegations set forth in Paragraph 64.  To the extent a response is required, Paragraph 64 is denied.

65.     Reynolds has and had full knowledge of the existence of the business relationships that SIS has with its direct customers and with auto dealers.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 65.

66.     Reynolds has intentionally caused, and/or is intentionally attempting to cause, SIS customers to discontinue or terminate their business relationships with SIS by engaging in unfair or deceptive trade practices, as set forth above.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 66.

67.     Reynolds' acts are of a tortious character, wanton, malicious, oppressive, and in deliberate or reckless disregard of the legal rights of SIS.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 67.

68.     SIS has suffered and will continue to suffer damages as the direct and proximate result of Reynolds' tortious interference with SIS's business relationships.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 68.

## COUNT V
### (Tortious Interference with Contract)

69.     Plaintiff SIS realleges and incorporates by reference herein each allegation contained above.

**Answer:**     Reynolds repeats and incorporates by reference herein its responses to each allegation of fact set forth above.

70.     SIS has existing contracts with 21 third-party application providers.

**Answer:**     Reynolds is without sufficient information to admit or deny the allegations set forth in Paragraph 70.

71.     Reynolds has and had full knowledge of these contracts between SIS and its application provider customers.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 71.

72.     Attachment I to the RIA even lists most, of not all, of SIS's application provider customers.

**Answer:**     Reynolds is without sufficient information to admit or deny the allegations set forth in Paragraph 72.

73.     Reynolds has intentionally caused, and/or is intentionally attempting to cause, SIS to breach its contracts with these customers.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 73.

74.     Reynolds' acts are of a tortious character, wanton, malicious, oppressive, and in deliberate or reckless disregard of the legal rights of SIS.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 74.

75.     SIS has suffered damages as the direct and proximate result of Reynolds' tortious interference with SIS's contracts.

**Answer:**     Reynolds denies the allegations set forth in Paragraph 75.

## COUNT VI
### (Unfair or Deceptive Trade Practices)

76.    Plaintiff SIS realleges and incorporates by reference herein each allegation contained above.

**Answer:**    Reynolds repeats and incorporates by reference herein its responses to each allegation of fact set forth above.

77.    Reynolds has deliberately and maliciously engaged in unfair methods of competition and unfair or deceptive acts or practice, in the conduct of its trade and/or commerce, which have been deliberately and maliciously designed to damage SIS's business, including, but not limited to:

a.    already unfairly, inequitably, and unreasonably interfering with the interfacing between SIS's integration software and the Reynolds' DMS used by auto dealers;

b.    unfairly, inequitably, and unreasonably refusing to agree to a reasonable wind-down period to occur after the RIA expires, after initially agreeing to such a wind-down as set forth above, and instead moving forward with a plan to completely disable, remove, and/or otherwise block the interfacing between Sis's integration software and the Reynolds' DMS used by auto dealers effective September 21, 2009; and

c.    unfairly, inequitably, and unreasonably obtaining proprietary customer information of SIS under the guise of good faith negotiations toward the new RIA, and then failing to return that information to SIS, to SIS's competitive disadvantage as set forth above, after effectively terminating negotiations by suddenly and dramatically changing its pricing proposals for the new RIA.

**Answer:**    Reynolds denies the allegations set forth in Paragraph 77.

21

78.   Reynolds' aforementioned conduct offends the public policy of Ohio, is immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to customers, competitors, and other businessmen, including, but not limited to, SIS.

**Answer:**   Reynolds denies the allegations set forth in Paragraph 78.

79.   SIS has suffered damages as the direct and proximate result of Reynolds' unfair methods of competition and unfair or deceptive acts or practice in the conduct of its trade and/or commerce.

**Answer:**   Reynolds denies the allegations set forth in Paragraph 79.

## II.   AFFIRMATIVE DEFENSES

1.   Reynolds hereby raises the following affirmative defenses:

   a.   **Failure of Consideration**: SIS has never paid any consideration including any fees associated with its alleged rights to license applications for integration with the RIA.  Although Reynolds denies that Section V(g) of the RIA provides SIS with any right to continued integration with the Reynolds DMS, even if it did, SIS's claim fails because the parties have never negotiated, and SIS has never paid, fees that are specifically set forth as a condition to Reynolds' providing such access.

   b.   **Estoppel**: Section V(g) of the RIA, by its plain terms, applies only when the parties have developed an "Interface" and an "Interfaced Product," as defined by the RIA.  To date, no such Interface or Interfaced Product has ever been defined, developed, tested, released, or certified under the RIA.  Having failed to develop an Interface and/or an Interfaced Product to which this section of the RIA is targeted (or paying any fees that would be

required if such an Interface had been developed), SIS is estopped from asserting rights to rely on this section.

c.    **License**: The RIA grants Reynolds a license to use the SIS eData product. All claims arising out of this use are barred by the affirmative defense of license.

d.    **Unclean Hands/Prior Material Breach**: To the extent that SIS has purported to grant third parties rights to interface with the DMS after the expiration of the RIA, it has done so in violation of the terms of the RIA. In light of that and other prior material breaches, SIS does not approach the Court with clean hands, and cannot obtain the equitable relief that it seeks in this lawsuit.

e.    **Contributory Fault.** SIS's damages, if any, were caused in whole or in part by its own tortious conduct.

f.    **Failure to Mitigate Damages**: To the extent that SIS has purported to grant third parties rights to interface with the DMS beyond the expiration of the RIA, it has done so in violation of the RIA. Hence, any alleged damages to SIS are self inflicted. Moreover, upon information and belief, SIS has and is continuing to enter into agreements with third parties to license products interfaced with the Reynolds DMS after it became aware that the RIA would and/or could expire on September 21, 2009. Reynolds cannot be liable for alleged damages arising out of contracts that SIS entered into with full knowledge that it could be unable to perform after the expiration of the RIA.

g.   **Failure to State a Claim upon which Relief can be Granted**:  SIS has never paid any amount to Reynolds for the rights granted under the RIA, and is not entitled to damages under the RIA.  SIS cannot state a claim without the essential element of damages.

h.   **Standing.**  SIS's claims for breach of contract and tortious interference with contracts must be dismissed because they are predicated on enforcing alleged agreements to which SIS is not a party, and which SIS has no standing to enforce.  As SIS admits in its Complaint, it maintains agreements with third party application providers, and not with automotive dealership end users.  Accordingly, it has not pleaded or otherwise demonstrated any right to sue to enforce the dealerships' agreements, and has no right to bring a claim for alleged tortious interference with those agreements.

i.   **Mootness.**  Each of SIS's claims predicated on Reynolds' retention of allegedly confidential information of SIS must be dismissed as moot.  Although Reynolds disputes that it has an obligation to destroy this information, the overwhelming majority of such information was destroyed prior to the initiation of litigation, except where necessary to perform Reynolds' obligations under the RIA.   Reynolds has determined that a small number of e-mails containing information that SIS claims as proprietary were inadvertently retained.   However, Reynolds has no objection stipulating to the destruction of these e-mails. Accordingly, these claims are moot and not justiciable in this Court.

j.      **Privilege:**  All of Reynolds' alleged actions giving rise to this lawsuit represent Reynolds' efforts to protect its own contractual rights and intellectual property upon the expiration of the RIA.   A person is privileged to cause another not to perform a contract, or enter into or continue a business relation with a third party, by asserting or threatening to protect a legally protected interest of his own which may otherwise be impaired or destroyed by the performance of the contract or transaction.

## III. COUNTERCLAIMS

### BACKGROUND

**The RIA and Exhibit E to the RIA**

1.      The Reynolds and Reynolds Company ("Reynolds") has developed proprietary processes for automobile dealerships that allow for access, display, creation of, and updating of certain data within the database of Reynolds' ERA dealer management systems ("DMS").  This technology enables retail auto dealers to manage inventory, customer contacts, financial and insurance information, and myriad other tasks involved in efficiently managing an automotive dealership.

2.      In developing and upgrading its DMS, Reynolds sometimes enters into agreements with third party software developers to integrate applications into the DMS for use by customers who chose to license the third party applications.

3.      SIS has attempted to carve out a niche for itself in this business model by inserting itself as a middleman between Reynolds and those third party application providers.

4.     Prior to September 21, 2006, there was no formal relationship between Reynolds and SIS relative to accessing dealer data, and SIS's attempts to interface with the Reynolds' DMS was what is known in the industry as "hostile."

5.     However, on September 21, 2006, SIS and Reynolds entered the Reynolds Interface Agreement ("RIA") to explore opportunities for SIS in this role.

6.     The RIA contemplated that at some future date, a Reynolds "Interface" and SIS "Interfaced Products" might be developed.  Under the RIA the contemplated Interface was to be a *Reynolds* integration process.  Once in place, the contemplated Reynolds Interface and SIS Interfaced Products, on one hand, would have provided SIS certain licensing rights.  On the other hand, once the Reynolds Interface was in place, SIS was required to pay fees to Reynolds including a Re-Certification fee for the Interfaced Product as well as Installation Fees, Monthly Interface Access Fees on behalf of each dealership to which SIS sold its Interfaced Products.  At the time of contracting, and through the time of this action, the amount of the fees to be paid by SIS once the Interface was in place was not determined.

7.     The Interface contemplated by the RIA was <u>never</u> defined, developed, tested, released, or certified.  And, therefore, SIS <u>never paid one dollar</u> to Reynolds under the RIA.  SIS did not complain that the Interface was not in place, nor did it offer to pay Reynolds any fees under the RIA.

8.     The RIA contemplated that there would be a period of time before the Interface and its related rights (SIS's license rights) and obligations (SIS's required payment of fees) would be in place.

9.     During that initial period, instead of the *Reynolds* Interface (which was not yet in place), the parties provided for use of SIS's eData integration tool.  SIS's eData integration tool

was to be used through an "RCI Gateway" into Reynolds DMS that was created and maintained by Reynolds to cordon off SIS's integration tool from the rest of Reynolds' DMS.

10.     The distinction between the SIS eData Product and the Interface is essential.  For the period in which SIS was licensed to integrate software with the DMS using the SIS eData Product, it was permitted to do so without paying fees to Reynolds other than minimal renewal fees (that were likewise never paid by SIS).  If SIS's integrated applications had been migrated to the contemplated Reynolds Interface and distributed as Interfaced Products, the economic terms of the RIA would become significantly more favorable to Reynolds, requiring SIS to pay a one-time installation fee for each dealership along with recurring monthly Interface Access Fees for such access on behalf of each of SIS's allegedly 4,000 plus Qualified End Users.

11.     Before the Interface was in place, and during the time the SIS eData integration tool was still in use, the RIA recognized the general provisions of the RIA governing the *Reynolds* Interface were not adequate to describe the parties' rights and obligations while the SIS eData integration tool was still in use.  Thus, the RIA provided that during this initial period, the parties' rights and obligations would be governed by Exhibit E to the RIA.  The RIA itself would only govern the relationship if there was not a conflict with the governing provisions in Exhibit E during this time.

12.     Because the Reynolds Interface was never defined, developed, tested, released, or certified, the parties at all times after entering the RIA operated under the provisions of Exhibit E to the RIA.

**Non Renewal of the RIA**

13.     Pursuant to the plain terms of the RIA, the agreement does not renew if either party gives notice of its intent not to renew at least one hundred eighty days prior to the end of the three year term of the agreement.

14.     The three year term of the agreement ends on September 21, 2009.

15.     On, January 19, 2009, more than 180 days prior to the September 19, 2009 ending date, Reynolds gave notice of its intent not to renew the RIA.

16.     Thus, by its plain terms, the RIA expires on September 21, 2009.

17.     The requirement for 180 days notice creates an automatic six-month contractual wind down period.  Although SIS was provided with more than eight months notice to engage in any wind down it deemed necessary, on information and belief, SIS instead allowed its vendors to proceed to sign up dozens of new dealerships in the final one hundred and eighty days, in an attempt to later claim it could thereby unilaterally extend the contract term to accommodate its new contracts with additional dealerships.

**SIS Is Not Permitted to Enter Contracts That Extend Beyond September 21, 2009**

18.     Under Exhibit E, SIS is permitted to enter into agreements with third party application providers to integrate software onto Reynolds' DMS using SIS's own "SIS eData Product" integration tool.  And it could do so without obligation to pay the fees that would be required once the Interface was developed.  However, under the controlling terms of Exhibit E, SIS was only permitted to integrate third party applications through its own integration tool if every third party agreement it entered into for this purpose contained terms *substantially similar to the terms of the RIA.*

19.     Importantly, the RIA by its express terms could, at either party's election, expire three years after the effective date – on September 21, 2009.

20.     Any agreement or promise entered into by SIS with third party application providers or dealerships that did not state and include the RIA's material expiration term – namely, that SIS's right to integrate with the Reynolds' DMS through its SIS eData Product could expire on September 21, 2009 – was entered into by SIS in direct violation of the terms of the RIA.

21.     Further, pursuant to the RIA, "**during the Term**, Distributor [SIS] may distribute the Interfaced Product and/or the SIS eData Product specified on Exhibit E...." (emphasis added). The RIA further provides that any such licensing must "comply with all applicable terms of this Agreement." Thus, nothing in the RIA or RIA Exhibit E permitted SIS to license access to the DMS for a period outside of the term.   If SIS has promised third party application providers greater rights than it received under the RIA, as SIS appears to allege, then SIS is in material breach of the RIA, and any injury it sustains is purely self-inflicted.

22.     Although the RIA requires SIS to provide Reynolds with copies of the contracts with dealerships, and although Reynolds requested this information of SIS on numerous occasions, SIS has to date never provided Reynolds with copies of these contracts.   Thus, Reynolds has no way to know for how long SIS has promised to provide access through Reynolds' RCI Gateway to any dealership. In any event, any promise by SIS to provide access beyond September 21, 2009 was made in violation of RIA Exhibit E's mandate and without Reynolds' knowledge or consent.

23.     Not only does any promise by SIS to third parties to unilaterally extend the term of the RIA violate the express terms of the RIA, SIS's eleventh hour claim that a non-Exhibit E

provision grants them such a right is belied by the very provision that SIS references. In its Complaint, SIS argues that such a right appears in Section V(g) of the agreement. But Section V(g) of the RIA provides:

> Upon termination of this Agreement, **[SIS] must cease all use, distribution, and sublicensing of the Interface**. [SIS]'s Qualified End Users will have the right to continue after this Agreement expires or is terminated **to use the Interface** in accordance with the previously granted End User License Agreements **subject to payment of all appropriate fees** as set forth herein. (emphasis added).

24.     Thus, Section V(g) is clear that it applies only to the use of the Reynolds Interface – not the SIS eData Product. Because there *is no Interface*, this section grants no continuing rights to SIS or any end user under the RIA.

25.     In addition, Section V(g) makes it abundantly clear that once the RIA terminates or expires, even if there were an Interface, "[SIS] must cease all use, distribution and sublicensing of the Interface." *Id.* To the extent it creates any rights under any circumstances (which it cannot because there *is no Interface*), it does not grant *any* rights to SIS.

26.     The RIA further required that, "**during the Term**, Distributor [SIS] may distribute the Interfaced Product and/or the SIS eData Product specified on Exhibit E...." *Id.* at p. 5, ¶ 11 (emphasis added). Nothing in the RIA or RIA Exhibit E permitted SIS to license access to the DMS for a period outside of the term, however. If SIS has promised third party application providers greater rights than it received under the RIA, as SIS appears to allege, then SIS is in material breach of the RIA, and any injury it sustains is purely self-inflicted.

27.     Simply put, SIS had no right to promise access to the DMS to any third parties for any period after the expiration of the RIA, and Reynolds is therefore justified in taking action to remove the SIS eData Product from its system.

**Breach of Confidentiality Requirements**

28.   Because of the proprietary nature of its business and the threat of hostile interfaces to its system and its experience with SIS as a hostile interfacer, Reynolds contracted for strict confidentiality provisions from SIS in the RIA.

29.   The RIA requires that SIS "will not disclose **any information** relating to the Interface, the implementation of the Interface, **or any other Confidential Information of Reynolds** to anyone, for any purpose, except employees and consultants that have executed agreements obligating them to comply with the provisions of this Agreement" (emphasis added).

30.   The RIA further provides that SIS "acknowledges that all **information concerning Reynolds**, its business plans, proprietary rights, the Interface, **the Reynolds' DMS,** customers and suppliers **will be deemed Confidential Information** of Reynolds whether or not marked "CONFIDENTIAL", and will not be used by Distributor except in the proper performance of its obligations under this Agreement…. In the event that either party is requested or becomes legally compelled (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information or take any other action prohibited hereby, **such party will provide the disclosing party with prompt written notice so that disclosing party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this agreement."**

31.   The confidentiality requirements were so fundamental to Reynolds that the limitations on both consequential and direct damages otherwise found in the RIA expressly *do not apply* to breaches of the confidentiality provisions of the agreement.

32.     Notwithstanding these clear confidentiality requirements, SIS has filed in the public record, both in its pleadings, and as exhibits to its pleadings in this matter, information deemed Confidential Information in the RIA including screen shots from the Reynolds DMS as well as descriptions of the Reynolds DMS.

33.     On information and belief, SIS has also disclosed this Confidential Information, including information regarding Reynolds' DMS security measures to other industry participants.

34.     After filing this lawsuit, SIS joined an industry group called "OSA." Recently at least one other member of OSA has begun collecting information regarding Reynolds Confidential Information regarding its security patch, including information contained in SIS's public filings in this matter, and begun compiling a "library" of Reynolds Confidential Information regarding its security patch to use in an attempt to avoid the application of the security patch.

35.     In addition, SIS has refused to return Confidential Information that Reynolds provided to SIS during recent negotiations towards a potential replacement contract for the RIA, including, but not limited to, Gap Analysis and Customer Requirements for Vehicle Inventory, Service Appointments, Repair Order, Parts, F&I (Lender/Deal/Reversal/Insert/Publish), Service Personnel and Customer Information. SIS must either return these and all other documents and information that were designated as confidential when sent to SIS, or it must confirm in writing that all such confidential documents and information have been destroyed.

36.     As a direct and proximate result of SIS's breach of the confidentiality provisions of the RIA, Reynolds has suffered and will continue to suffer direct and consequential damages. Such damages stem from the loss and/or impairment of Reynolds's confidential and proprietary

information that has been developed, safeguarded and protected by Reynolds so as to enable it to compete (and provide it with competitive advantages) in the marketplace and include, without limitation, costs of enhanced security measures, lost revenues, goodwill, and injury to its competitive position in the marketplace.

**Breach of Requirement to Provide Information**

37.     The RIA also requires that SIS provide Reynolds with a list of the qualified end users of SIS's eData Product with access to the DMS through the RCI Gateway *and* to provide Reynolds with copies of any agreements executed by any such eData users.

38.     Before filing its lawsuit, SIS never provided Reynolds with a list of the eData users and to date it has still not provided copies of any agreements executed by any such eData users.

39.     In addition, the RIA requires SIS to provide Reynolds with a listing of third party application providers who subscribe to SIS's data extraction services and to notify Reynolds promptly if any third party application providers or end users are added or deleted.   On information and belief, third party application providers and end users have been added and/or deleted.  SIS has not notified Reynolds of third party application providers who have been added or deleted.

40.     The RIA also requires, when any end user dealership or third party application provider renews its agreement with SIS, SIS is to pay Reynolds 25% of any flat fee amount collected from any third party provider or dealership.   On information and belief, SIS has renewed agreements with end users and/or third party application providers. SIS has not notified Reynolds of any such renewals or paid any fees pursuant to the RIA.

## COUNT I
## DECLARATORY JUDGMENT

41.     Reynolds realleges and incorporates by reference herein each allegation contained in its Counterclaims above.

42.     Pursuant to the plain terms of the RIA, the RIA expires on September 21, 2009.

43.     Nothing in the RIA grants SIS any right to continue to use the SIS eData Product through the RCI Gateway to Reynolds' DMS beyond September 21, 2009.  Nevertheless, SIS disputes Reynolds' right to disable SIS's access to the RCI Gateway and remove SIS's eData Product from Reynolds' DMS after September 21, 2009.

44.     Further, the RIA prohibits SIS from disclosing any information regarding Reynolds' DMS.  Without justification, SIS has breached the RIA by disclosing Reynolds' Confidential Information.   SIS has admitted in its pleadings that it is aware that market participants with no right of access may become aware of this disclosed information through its public posting of the information.  SIS has further refused to return Confidential Information received from Reynolds during recent negotiations.

45.     The RIA also requires that SIS provide Reynolds with copies of any agreements executed by any eData users accessing the Reynolds DMS through the RCI Gateway.  SIS has not provided these agreements.

46.     The RIA also requires SIS to provide Reynolds with a listing of third party application providers who subscribe to SIS's data extraction services and to notify Reynolds promptly if any third party application providers or end users are added or deleted.  Pursuant to the RIA, when any end user dealership or third party application provider renews its agreement with SIS, SIS is also required to pay Reynolds 25% of any flat fee amount collected from any third party provider or dealership.  SIS has not complied with these provisions either.

47.     An actual and justiciable controversy exists between Reynolds and SIS regarding the parties' rights and obligations under the RIA.

48.     A judicial determination is necessary at this time so that the parties' dispute may be resolved and that the parties may be aware of their respective rights and duties.

49.     Reynolds is entitled to a declaration of the rights and obligations of the parties under the RIA.

## COUNT II
## BREACH OF CONTRACT

50.     Reynolds realleges and incorporates by reference herein each allegation contained in its Counterclaims above.

51.     It is undisputed that the RIA is a valid and binding contract.

52.     SIS has breached its contract by:

  a.  Disclosing Confidential Information in violation of the RIA;

  b.  Refusing to return Confidential Information received from Reynolds during recent negotiations;

  c.  Refusing to provide Reynolds with copies of any End User Agreements executed by eData product users with access to the DMS through the RCI Gateway;

  d.  Refusing to provide a list of third party application providers who subscribe to SIS's data extraction services or to notify Reynolds promptly if any third party application providers or end users are added or deleted; and

  e.  Refusing to inform Reynolds when any end user dealership or third party application provider renewed its agreement with SIS, and refusing to pay Reynolds the contractually agreed to fee on all renewals.

53.    As a direct and proximate result of SIS's breaches described above, Reynolds has suffered and will continue to suffer direct and consequential damages including costs of enhanced security measures, lost revenue, and damage to its goodwill and business reputation.

## PRAYER

WHEREFORE, Reynolds requests a judgment against SIS as follows:

1. A declaration that:

   a. After September 21, 2009 Reynolds may remove or disable access to Reynolds' DMS by users accessing the DMS through Reynolds' RCI Gateway through SIS's eData Product.

   b. SIS may not disclose to anyone any of Reynolds' Confidential Information.

   c. Reynolds is entitled to the return of its Confidential Information provided to SIS during recent negotiations.

   d. SIS must immediately produce to Reynolds copies of any agreements executed by any eData users accessing the Reynolds DMS through the RCI Gateway.

   e. SIS must immediately produce to Reynolds information regarding all third party application providers or end users added or deleted during the term of the RIA including the date of the addition or deletion.

   f. SIS must immediately produce to Reynolds a list of every dealership or third party application provider who renewed its agreement with SIS during the term of the RIA, including the date of the renewal, and the amount of the flat fee collected from any such third party provider or dealership by SIS.

g.   For every dealership or third party provider that renewed during the term of the

RIA, SIS must immediately pay the contractually agreed to fee on all renewals;

and

2.   Monetary judgment consisting of direct and consequential damages in an amount to be

proven at trial, including lost revenue and damage to goodwill and business reputation,

caused by SIS's breaches of contract; and

3.   Monetary judgment consisting of Reynolds' costs, expenses, and reasonable attorneys

fees in connection with this litigation; and

4.   All such further relief as the Court may deem just and proper.

Dated: September 11, 2009

Respectfully submitted,

/s/James H. Greer
David C. Greer, Trial Attorney (0009090)
James H Greer, Trial Attorney (0046555)
Bieser, Greer & Landis LLP
400 National City Center
6 North Main Street
Dayton, Ohio  45402-1908
Tel:  937.223.3277
Fax:  937.223.6339

GIBBS & BRUNS, L.L.P.
Grant J. Harvey, *pro hac pending*
Aundrea K. Frieden, *pro hac pending*
Angus J. Dodson, *pro hac pending*
1100 Louisiana, Suite 5300
Houston, Texas  77002
Tel:  713.650.8805
Fax:  713.750.0903

ATTORNEYS FOR DEFENDANT,
THE REYNOLDS AND REYNOLDS COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Original Answer, Affirmative Defenses, and Counterclaims Subject to Partial Motion to Dismiss was served on counsel for the Plaintiff Superior Integrated Systems, Inc., as identified below, by electronic mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) this 11th day of September, 2009.

Keven Drummond Eiber
keiber@brouse.com
Anastasia J. Wade
awade@brouse.com
BROUSE MCDOWELL
1001 Lakeside Avenue, Suite 1600
Cleveland, Ohio 44114-1151
Tel: (216) 830-6816
Fax: (216) 830-6807

Barry Buchman
buchmanb@gotofirm.com
Gilbert LLP
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Tel: (202) 772-2305
Fax: (202) 772-2307

/s/ James H. Greer