IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| SUPERIOR INTEGRATED SOLUTIONS, INC., | ) | CASE NO. 3:09-CV-314 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Rose |
| | ) | |
| THE REYNOLDS AND REYNOLDS COMPANY | ) | Magistrate Judge Sharon L. Ovington |
| | ) | |
| Defendant. | ) | |
| | ) | ORAL ARUGMENT REQUESTED |

**DEFENDANT REYNOLDS AND REYNOLDS COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR TEMORARY RESTRAINING ORDER PENDING PRELIMINARY INJUNCTION (Docket No. 20)**

Defendant Reynolds & Reynolds, Inc. ("Reynolds") respectfully files this Response in Opposition to Plaintiff SIS's Motion for Preliminary Injunction or, in the Alternative, for Temporary Restraining Order Pending Preliminary Injunction (Docket No. 20) ("Motion" or "Mem." if referring to the Memorandum in Support).

I. INTRODUCTION

SIS seeks a court-created "equitable," ***open-ended***, extension to the RIA,[1] a contract that by its own unambiguous terms ends on September 21, 2009.[2] SIS argues that § V(g) of the RIA

---

[1] The Reynolds Interface Agreement will be referred to as the RIA and is attached hereto as Exhibit 1. References to exhibit numbers are to exhibits to the Affidavit of Robert Schaefer, which is attached hereto as Exhibit A. Both the Schaefer Affidavit and the exhibits thereto are incorporated by reference as if fully set forth herein, and Reynolds gives notice of its intent to rely on this evidence at any hearing on the merits of the instant Motion.

[2] On September 18, 2009, to accommodate Reynolds's counsel's schedule for the hearing on this Motion, the parties stipulated that the RIA's September 21, 2009 expiration date would be extended to September 23, 2009. *See* Stipulation (Docket No. 22).

1

is the support for this extension—but as discussed below, this section unambiguously grants no such rights. SIS's contract argument is unsound, so it spends the bulk of its Memorandum discussing the alleged harm it will sustain if this Court does not simply rewrite the RIA to provide SIS with an extension of the contract term—an extension it was not able to obtain at the negotiating table.

The harm SIS claims is this: SIS implies (it does not come right out and state this) that it has obligated itself to provide integration services to 21 third-party vendors ("Vendors") for a period of time that exceeds the term of the RIA and that SIS will be harmed if it is not allowed to continue earning profits from these Vendors after the RIA term is over. This story, however, is unappealing on its face. That SIS *may* not be able to earn the same level of profits in a post-RIA world is not a basis for the Court to rewrite the RIA to include an extension of its term. If it were, the courthouse would be overwhelmed by people seeking court-ordered rewrites of contract termination dates.

SIS tries to bolster its "harm" argument by focusing on the harm that will allegedly befall SIS's 21 customers (the Vendors) or perhaps its customers' customers (various dealerships). But if others will in fact be harmed, as SIS has alleged, SIS has only itself to blame. If SIS contracted to provide the Vendors with rights that SIS was not in a position to provide post-September 21, and if these Vendors in turn did the same with respect to dealerships, then the Court may well have a legitimate role to play in sorting out SIS's liability to its Vendor-customers and perhaps also to its Vendors' customers (the dealerships). But assuming this is what SIS is complaining about, it provides no legal basis for SIS to obtain a court rewrite of its contract with Reynolds.

## II. FACTUAL BACKGROUND

### A. The Reynolds DMS and Reynolds Infrastructure

Reynolds owns and operates a proprietary information management system for automotive dealers called the Dealer Management System (DMS). *See* Schaefer Aff., Ex. A, ¶ 2. The Reynolds DMS includes hardware and software applications that enable auto dealers to manage inventories, customer contacts, and other automotive dealership tasks. *Id.* Dealerships contract with Reynolds directly for the DMS. *Id.* Reynolds also maintains, at great expense, an extensive infrastructure to support its DMS customers. *Id.* Reynolds's support structure includes on-going maintenance and security, help desk support, a well-trained sales force, and monitoring of important legislation regarding dealers' data security. *Id.* For a fee, Reynolds also provides integration of third-party software to permit other application providers to integrate their applications onto the Reynolds DMS. *Id.* ¶ 3. By providing integration for these third-party applications, Reynolds is able to ensure that the security as well as the performance of its DMS will not be adversely impacted through the use of these third-party applications with the DMS. *Id.* Reynolds has integrated literally dozens of third-party applications to its DMS—applications that are generating profits for a whole host of third-party application providers. *Id.*

### B. Before the Agreement: SIS Hacked into Reynolds System As a "Hostile" Interfacer

In contrast to third-party application vendors, for whom Reynolds provides integration services which enable their applications to integrate with the DMS, SIS chose a different route. First, SIS does not create applications. Ex. A ¶ 4. Instead, starting as early as 1996, SIS and its predecessors began secretly hacking into Reynolds's DMS and selling integration services to application vendors without Reynolds's knowledge or consent. *Id.* ¶ 5. As Battista admits in his affidavit, SIS was forced to "navigate around Reynolds'[s] purported security measures"— i.e., to hack into the DMS without permission and conceal its software on the DMS in hopes that

3

it will escape detection and removal by Reynolds. *See* Mem., Battista Aff. ¶ 10; *see also* Ex. A ¶ 7. SIS went to extraordinary measures to evade Reynolds' security measures, including hiding files on the system, using deceptive file names, and creating a program to automatically delete and replace itself in a new area on the system on a daily basis. Ex. A ¶ 7.

Hackers like SIS, who break into and host applications, for their own fee, on another's proprietary hardware and software are known as "hostile" interfacers.[3] *See id.* ¶ 6. Reynolds routinely purges hostile integration attempts from its DMS in order to protect the integrity of its system, its customer's data, its goodwill, and its right to provide its services on its own system to its own customers. *Id.* ¶ 6. SIS does not dispute that Reynolds was well within its rights when it purged SIS's hostile interfacing—to the contrary, it argues that this "cat-and-mouse" game of code insertion and deletion is an accepted alternative to contracting. *See* Mem. at 4.

C.  **The Reynolds Interface Agreement**

By 2006, Reynolds and SIS agreed to negotiate the development of a ***Reynolds*** interface that would replace the hostile SIS integration that SIS was selling to various third-party vendors. *Id.* ¶ 8. The product of these negotiations was the RIA.

The RIA is a two-phase agreement. During the first phase of the RIA, Reynolds agreed to develop the Interface, which upon completion would replace SIS's integration product known as the eData Product. *Id.* ¶ 9. Until the Interface was completed, SIS was permitted to sell its SIS eData Product to a specific list of 21 vendors. Ex. A ¶ 11; Ex. 1 at Ex. E, p. 18. SIS was not required to pay any fees to Reynolds during this first phase—unless it renewed contracts with these Vendors, in which case the RIA required SIS to pay Reynolds a certain percentage of the fees SIS earned. *See* Ex. A ¶ 11; Ex. 1 at Ex. E § I(6). To be clear, SIS has never paid a dime to Reynolds under the RIA, *see* Ex. A ¶ 11, and its failure to provide fees based upon renewals is

---

[3] *See also* Ex. 1 at Ex. E § I(9) (expressly prohibiting SIS's "hostile interface or screen scraping activities").

4

one subject of Reynolds's counterclaims. During this first phase, SIS provided Reynolds with a license for SIS's eData Product, and even agreed to indemnify Reynolds from liability relating to SIS's provision of integration services via its eData Product. Ex. 1 at Ex. E §§ I(1), I(3).[4]

The second phase of the RIA begins when the Interface developed by Reynolds is completed. During the second phase, the relationship changes dramatically. First, SIS agreed to migrate its customers (the Vendors) from its eData Product to the Interface. *Id.* at § II(10). Second, the RIA required SIS to pay Reynolds fees according to a "to be agreed-upon" schedule. *Id.* §§ IV & Ex. D. Third, SIS was required to go through a stringent certification process before applications were integrated. *Id.* §§ II(1), III(1)-(5). Additionally, in the second phase, Reynolds would license to SIS *its* Interface (rather than the other way around), and Reynolds agreed to provide indemnification to SIS with respect to Reynolds's Interface.

The two phases of the RIA are embodied in two different sections of the RIA. The first phase (the SIS eData Phase) is covered in Exhibit E to the RIA—this is the portion of the RIA that SIS pretends does not exist in its Motion when it cites to § V(g) in the main body of the RIA as support for the "wind-down" period. SIS misleads the Court when it claims that the RIA was a Reynolds "form contract." To the contrary, Exhibit E, which ultimately controls the parties' relationship during the first phase, was initially drafted by SIS and was, thereafter, heavily negotiated by the parties.[5] Ex. A ¶ 8. All in all, between April and August 2006, multiple drafts of the RIA were exchanged between the parties, and much of the focus was on Exhibit E. *Id.* The RIA was finally executed on September 21, 2006. *Id.*; Ex. 1 at 1.[6]

---

[4] SIS was also permitted to hold itself out as certified for purposes of Reynolds's Certified Interface Program (RCI) pending the development and actual certification of products integrated through a Reynolds Interface, although it was never actually certified pursuant to the RIA. See Ex. 1 at Ex. E; Ex. A ¶ 11.
[5] Under the RIA, during the initial development stage of the Interface, "If there is a conflict between the Agreement and Exhibit E, Exhibit E shall govern. Otherwise, the Agreement applies to Exhibit E." Ex. 1 at Ex. E, p. 18.
[6] Mr. Battista's focus on the March 27, 2006 email (wherein Reynolds attached a draft RCI Agreement), which predated the creation of Exhibit E by SIS and the negotiations that followed, is at best a red herring.

Reynolds worked on the design of the Interface, with SIS's input, but it was not completed by the end of the RIA term. Ex. A ¶ 13. Thus, during the three years that the RIA remained in place, the parties operated exclusively under the first phase of the RIA (Exhibit E), and SIS's third-party applications were at all times interfaced with the SIS eData Product through the RCI Gateway—and never through the Reynolds "Interface." *Id.* Not surprisingly SIS did not complain in the real time that the Interface was not developed nor did it push to have the process concluded because under the RIA, once the Interface was developed, SIS would be obligated to move its Vendor customers to the Interface, to *pay* Reynolds, and to comply with Reynolds's certification process. *Id.*[7]

On January 19, 2009, Reynolds gave SIS eight-months' written notice of its intent not to renew the current RIA. *Id.* ¶ 15; *see also* Ex. 2.[8] Neither the adequacy of the notice nor the RIA's expiration date is disputed by SIS.

### III. STANDARD OF REVIEW

Injunctive relief is an extraordinary remedy, and SIS bears the heavy burden of demonstrating that the circumstances clearly demand it. *See Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion . . . because the preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000);

---

[7] SIS drops a sentence in its Memorandum purporting to complain about the fact that the Interface was never developed. But this is not mentioned as a basis for any breach of contract claim by SIS, or any real-time claim under the cure provisions of the RIA, which in light of the above, is not surprising.

[8] SIS mischaracterizes the notice, which is clear on its face, and Reynolds invites the Court to review this short, two-sentence document. Ex. A ¶ 15; Ex. 2. Although Reynolds did invite further negotiations with respect to the possible entry into a new agreement to replace the RIA—Reynolds's decision to terminate the existing agreement, the RIA, at the end of its term on September 21, 2009 was made crystal clear.

*see also Nat'l Wildlife Fed'n v. Burford,* 878 F.2d 422, 432 (D.C. Cir.1989). The factors to be considered in determining whether to issue a preliminary injunction are (1) a strong or substantial likelihood or probability of success on the merits, (2) irreparable injury, (3) the potential substantial harm to others, and (4) the interests of the public served. *See, e.g., Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 888 (6th Cir. 2000). No one factor controls, but "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000); *see also Mich. State AFL-CIO v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997).

## IV.  ARGUMENT & AUTHORITIES

A.  <u>SIS Does Not Demonstrate That It Can Succeed on the Merits</u>

    1.  **The Plain, Unambiguous Terms of the RIA Do Not Provide for a "Wind-Down" Period for SIS's eData Product After the RIA Expires**

Section V(g), which SIS contends provides it with the right to a "wind-down" period, has application only to the second phase of the RIA—after the Interface is completed and after the Vendors are moved to the Interface developed by Reynolds. It does not apply to the first phase of the RIA, when the integration is being provided by SIS's eData Product. Section V(g) on which SIS relies for this proposition states plainly:

> (g)  Upon termination of this Agreement, Distributor [SIS] <u>must cease all use</u>, distribution, and sublicensing ***of the Interface***. Distributor's Qualified <u>End Users</u> will have the right to continue after this Agreement expires or is terminated to use ***the Interface*** in accordance with previously granted End User License Agreements subject to payment of all appropriate fees as set forth herein.

Ex. 1 § V(g) (emphasis added).

The "Interface" that triggers this switch from Phase 1 (SIS eData Product, Exhibit E world) to Phase 2 (Reynolds Interface, main agreement world) is an unambiguously defined term

7

in the contract. The "Interface" is *Reynolds's* own, proprietary integration tool. The RIA provides:

> REYNOLDS' SERVICES. **Reynolds has developed** certain processes, which include, but are not limited to, software, hardware, specifications, data formats, security codes and other intellectual property (collectively, the ***"Interface"***), that allow for the access, display, creation of, and updating of the data within the database of Reynolds' dealer management system.

*Id.* ¶ I(1) (emphasis added). The "Interface" as defined by the RIA is unambiguously not the *SIS eData Product* used during Phase 1 of the RIA. RIA Exhibit E provides:

> **Reynolds shall Use *the SIS eData Product*** as set forth above as necessary to facilitate SIS eData Product Qualified End Users in their use of the SIS eData Product ***until such time as the Interface*** is available for general commercial release ***by Reynolds*** . . . .

Ex. 1 at Ex. E § I(2) (emphasis added); *see also id.* § I(8) (likewise distinguishing the SIS eData Product from the Reynolds "Interface").

If the parties were in a Phase 2 world (a post-Interface world) when the RIA expired (which they are not), under § V(g), Reynolds would permit dealerships—not SIS—the right to use Reynolds's *own* "Interface" during a post-contract period, and Reynolds would have the right to earn its fees. *Id.* § V(g). But that is not the world the parties are in. Instead, they are in the Phase 1 world where there is no Interface and where § V(g) has no application.

SIS now claims that the defined term "Interface" contained in § V(g) includes the SIS eData Product. *See* Mem. at 11-12. There is literally no support whatsoever for this interpretation in the RIA.

First, § V(g) nowhere mentions SIS's eData Product. Second, § V(g) states plainly, as SIS admits, that even if there were an Interface, SIS ***"must cease all use"*** of that Interface. *See* Mem. at 5; Ex. 1 § V(g). And § V(g) clearly applies only to use of the "Interface," which as

8

noted above, is defined as ***Reynolds's*** integration tool and is expressly ***distinguished from*** SIS's eData Product. *See* Ex. 1 § I(1); *id.* at Ex. E, p. 18.

As SIS states, "[u]nder Ohio law, 'Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract.'" Mem. at 11 (quoting *City of St. Mary's v. Auglaize County Bd. of Comm'rs*, 875 N.E.2d 561, 566 (Ohio 2007)). Reynolds could not agree more. The language of § V(g) is not ambiguous. The word "Interface" has to mean something in this contract, and SIS's interpretation completely writes it out of § V(g). Because the express terms of § V(g) state that it is only applicable in the event SIS was using the Interface and because there is no Interface, there is no wind-down period, and the Agreement expires naturally on September 21, 2009.

### 2. SIS's "Interpretation" Is Unreasonable and Cannot Be Harmonized by the Language of § V(g)

As SIS admits, "[u]nder Ohio law, a contractual provision is ambiguous if 'the language is susceptible to two or more reasonable interpretations.'" Mem. at 12 (quoting *Safedoff v. Access Group Inc.*, 524 F.3d 754, 763 (6th Cir. 2008)). Reynolds's plain language reading makes sense, whereas SIS's strained interpretation is not reasonable.

Under Reynolds's interpretation (where "Interface" means the Interface developed by Reynolds), the first sentence of § V(g)—"Upon termination of this Agreement, Distributor must cease all use, distribution, and sublicensing of the Interface"—means ***exactly*** what it says. When the RIA expires on September 21, 2009, had there been an Interface developed by Reynolds, SIS would not have been able to use the Interface, distribute the Interface, or sublicense the Interface.

The second sentence—"Distributor's Qualified End Users will have the right to continue after this Agreement expires or is terminated to use the Interface in accordance with previously granted End User License Agreements subject to payment of all the appropriate fees set forth

9

herein"—also means *exactly* what it says. Had there been an Interface in place (created by Reynolds and licensed to SIS), although **SIS** could no longer use it, Reynolds would still permit Qualified End Users to continue using **Reynolds's** Interface. This sentence is in complete harmony with the first sentence because it recognizes that Reynolds is the owner of the Interface that it has developed, and although SIS no longer has any rights to use, distribute, or sublicense it, Reynolds will still permit the End Users to use it until their contracts expire as long as they pay appropriate fees to Reynolds.

Today, in the pre-Interface world, SIS—not Reynolds—is providing the integration, and it is the eData Product that SIS's Vendors and its End Users are licensing and using to integrate with Reynolds's DMS. So SIS is forced to argue that "Interface" in § V(g) means its eData Product in spite of the fact that as a defined term, "Interface" refers to the Reynolds-developed integration product. But if one substitutes "SIS eData Product" for the "Interface," as SIS argues, the two sentences of § V(g) are, together, nonsensical. According to SIS, the first sentence of § V(g) would then provide that "[u]pon termination of this Agreement, Distributor [SIS] must cease all use, distribution and sublicensing of [the SIS eData Product]." Thus, read literally, the first sentence would mean that SIS cannot continue using or licensing its own product to integrate the Vendors with Reynolds's DMS. Of course, that sentence then collides with the second sentence, which according to SIS, would provide that its "End Users will have the right to continue after this Agreement expires or is terminated to use [SIS's eData Product] in accordance with previously granted End User License Agreements subject to payment of all appropriate fees as set forth herein." In other words, SIS cannot use or license its eData Product, as it is currently doing, to enable Vendors and End Users to integrate to Reynolds's DMS, but the Vendors and End Users can use SIS and license from SIS its eData Product to integrate to Reynolds's DMS. This interpretation contradicts itself and is nonsensical. Presumably, this is

10

why SIS has, in its argument, inserted into the first sentence the phrase "to set up new customers" so that it reads "[u]pon termination of this Agreement, Distributor [SIS] must cease all use, distribution and sublicensing of Interface [to set up new customers]." Mem. at 5-6, 11. Those words do not, however, exist in the text of § V(g). The prohibition that SIS "<u>must cease all use</u>, distribution, and sublicensing" is all encompassing and is not limited to "setting up new customers." SIS's effort to include a phrase that "helps" avoid the internal inconsistency is an admission that actual text of § V(g) does not mean what SIS says it means.

In addition, the right of Vendors or End Users to license the Interface requires that Reynolds be paid the appropriate fees. This only makes sense in a world where there are in fact fees to be paid to Reynolds. But in the real world (the pre-Interface World), there are no fees to be paid to Reynolds because SIS is providing integration services under Exhibit E free of charge (that is free of paying fees to Reynolds).[9]

Lastly, SIS's contention that ambiguities in a contract must be construed against the drafter does not change the result. First, as one of SIS's cases makes clear, "this *contra proferentem* rule does not allow a court to adopt an unreasonable interpretation of the contract." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008); *see also Beverly v. Parilla*, 848 N.E.2d 881, 887 (Ohio Ct. App. 2006). As explained, SIS's interpretation is unreasonable and should be rejected. Second, as discussed above, § V(g) is ***not*** ambiguous. Therefore, this principle has no application in this case. *See Davidson Volkswagen, Inc. v. Chulka*, No. 37662, 1978 WL 218144, at *5 (Ohio Ct. App. Sept. 21, 1978). Finally, SIS cannot legitimately argue that it was somehow the weaker of the two negotiating parties. *See* SIS Memo. at 14. The terms

---

[9] SIS's citation to Exhibit E, § I(4) cannot create any ambiguity. Mem. at 13. The language quoted by SIS is contained in a *heading* in Exhibit E. The Agreement explicitly states, immediately above the signatures of the parties, that "[t]he section headings are for convenience only and **will not be used in interpretation of this Agreement**." Ex. 1 § VI(10) (emphasis added). Moreover, "Interface," as it is used in the main body of the RIA, is expressly defined in the RIA as a product that **Reynolds** (not SIS) developed, *see* Ex. 1 § I(1), and is *distinguished from* the SIS eData Product in Exhibit E.

of the RIA were vigorously negotiated by both sides over the course of more than five months and with multiple drafts, and Exhibit E was in fact initially drafted by SIS. Ex. A ¶ 8.

### 3. SIS's "Gap-Filler" Argument Is Baseless

SIS next asserts that even if the Court accepts Reynolds's correct interpretation of § V(g), it "would still be entitled to a wind-down period," Mem. at 14, because, according to SIS, "[u]nder Ohio law, 'where a matter was not resolved explicitly by the parties' then '[t]he parties to a contract are required to use good faith to fill the gap of a silent contract.'" Mem. at 14 (citing *Savedoff*, 524 F.2d at 764). First, there is no so-called "gap" in the RIA. It expressly has an expiration date of September 21, 2009 with 180-days' notice. *See* Ex. 1 § II(2). SIS has had well over 180 days to prepare to integrate the 21 vendors with its hostile, replacement code and to ready itself for Reynolds's countermeasures.[10] Second, SIS's argument that "the parties both contemplated <u>some type of</u> wind-down period before the Reynolds-certified integration ended" is false. Mem. at 15. To support this contention, SIS points to Reynolds's statement in its counterclaim that the 180-days' notice period was a built-in wind-down period. *See id.* That Reynolds points out that SIS failed to take advantage of the 180 days plainly provided by the RIA (and here it actually had eight months) at its own peril, does not demonstrate that even *more* time should be judicially created. It is SIS who put itself in this untenable position, and it should not be permitted to rewrite the RIA to resolve a problem that SIS itself created.

### 4. A Preliminary Injunction Hearing Is Not Warranted Because the RIA Is Not Ambiguous

SIS's request for an evidentiary preliminary injunction hearing "to air the wind-down dispute more fully" should be rejected. Mem. at 15. A hearing is not always necessary on a motion for a preliminary injunction. *See Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172 (3d

---

[10] Reynolds maintains, of course, all rights to protect its intellectual property and proprietary information includes it rights to assert claims for tortious interference with the DMS contracts it has with the dealerships.

12

Cir. 1990); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir. 1988); *Potter v. Havlicek*, No. 3:06-cv-211, 2007 WL 539534 (S.D. Ohio Feb. 14, 2007). For example, a hearing may be unnecessary where, as here, unambiguous documents dispel the need for oral testimony. *Aoude*, 862 F.2d at 894. Similarly, "a decision may be based on affidavits and other documentary evidence if the facts are undisputed and the relevant factual issues are resolved, [or where] the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley*, 910 F.2d at 1176. Because the RIA is not ambiguous, and SIS has raised no colorable claim to relief, extrinsic evidence is unnecessary to dispose of SIS's claim to continue interfacing with Reynolds's DMS.

**B.    SIS Has not Met its Burden to Show Irreparable Harm to Itself**

Evidence of irreparable harm is a long-standing threshold for granting injunctive relief. *See N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 170 (6th Cir. 1989); *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102-03 (6th Cir. 1982). SIS has not met this burden. Section V(g) of the RIA, at most, creates a right of others (not SIS who must "cease" use) "to use the ***Interface in accordance with previously granted End User License Agreements*** subject to payment of all appropriate fees." Ex. 1 § V(g).

SIS does not allege or offer ***any evidence*** that the End Users were granted contractual rights to use applications sold to them by SIS's Vendors beyond the contract term of the RIA.[11] Nor has SIS alleged or offered any evidence to the effect that its Vendors have contractual rights (granted by SIS) to use SIS's eData Product to integrate with Reynolds's DMS beyond the term

---

[11] Literally, the only evidence offered by SIS is a form from an auto dealership authorizing a third-party application provider to install an interface on the dealers' DMS server. *See* Battista Aff. at Ex. B. That exhibit does not provide any user any rights to SIS's eData Product after the expiration of the RIA. *See id.* Thus, SIS has not alleged or offered evidence of any third-party rights to continue to use the SIS eData Product, and SIS cannot establish that any contract rights of third parties will be infringed when SIS loses its access to the Reynolds DMS when the RIA expires.

13

of the RIA.[12] Instead, the only evidence offered by SIS of harm is the loss of business it allegedly will sustain simply by virtue of the fact that the RIA has (or should have) ended. The loss of business that results from the fact that a contract has ended is not a legitimate basis to extend the term beyond that agreed to.

Moreover, equity will not require Reynolds to pay the price for SIS's mistake. SIS could have protected itself by conforming its agreements to the RIA (by, for example, providing an "out" to itself in its own contracts, if the RIA expired). Indeed, under Exhibit E, it was required to do just that. Ex. 1 at Ex. E p.18. However, far from managing its affairs to avoid injury to itself and third parties, during the weeks leading up to the RIA termination, SIS has actually accelerated its efforts to integrate users to the system. Ex. A ¶ 19; Ex. 12. SIS cannot rely on its own deliberate actions to <u>create</u> the harm it hopes to avoid as a basis for seeking injunctive relief. *See Chicago Title Ins. Corp. v. Magnuson*, No. 2:03-CV-368, 2005 WL 2373430, at *28 (S.D. Ohio Sept. 26, 2005) (finding that balance of harms weighs against party that incurred self-inflicted hardships), *reversed in part on other grounds by* 487 F.3d 985 (6th Cir. 2007); *Damon's Restaurants, Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 626-27 (S.D. Ohio 2006) (balance of harms weighs against party whose harms were created by repeated breaches of contract).

Lastly, SIS claims that it does not need to be certified by Reynolds to provide integration. Indeed, it claims that it needs the "wind-down" period so it can create and market its latest integration of its hostile integration product. Mem at 8. Its admitted ability in that regard further undermines its contention that it is facing irreparable harm based upon Reynolds's

---

[12] The JM Solutions letter discussed by Battista simply reflects that JM Solutions relied on SIS's false representation that it could continue to use SIS integration tools to access to the DMS beyond September 21, 2009. Battista Aff. at Ex. P. And it also reflects that SIS's customers, like JM Solutions, upon learning of SIS's misrepresentation, have found alternative sources for their integration needs. *See id.* at Exs. P & Q.

actions. Its harm, if any, stems from its delay in preparing for the September 21, 2009 termination date.[13]

C.  **Reynolds Will Suffer Substantial Harm in the Event an Injunction Is Issued**

SIS's conclusory assertion that Reynolds will suffer no harm as a result of an injunction is simply false. Where harm to others exists from an injunction, the party seeking the injunction must demonstrate that its own irreparable injury "decidedly outweigh[s]" the harm flowing to the nonmovant. *See Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir. 1985); *Extracorporeal Alliance, L.L.C. v. Rosteck,* 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003). Reynolds would experience substantial harm if it were deprived of its contractually negotiated right to end its relationship with SIS. To begin with, the continued use of the SIS eData Product impairs Reynolds's ability to provide a secure and safe DMS product to its Dealers. Ex. A ¶ 22. This is a serious issue because the ability to access confidential and proprietary data (including dealership data and customer data that includes social security numbers) is at stake. *Id.* ¶ 23. *See also Zango, Inc. v. PC Tools Pty Ltd.,* 494 F. Supp. 2d 1189, 1196 (W.D. Wash. 2007) ("Defendant's harm consists both in its own reputational interest [and] in being able to properly block software it deems harmful."). Additionally, Reynolds has a right to negotiate with application vendors for the provision of a Reynolds-developed Interface without being forced to preserve or protect SIS's, now hostile, integration product. While SIS would undoubtedly love to have this Court force Reynolds to allow SIS to continue earning fees on its hostile integration product until such time as SIS has developed yet another replacement hostile integration product

---

[13] It is also well established that equity aids the vigilant. *See, e.g., Ins. Co. of N. Am. v. Traveler's Ins. Co.,* 692 N.E.2d 1028, 1036 (Ohio Ct. App. 1997) (noting "the ancient maxim that "'[e]quity aids the vigilant, not those who slumber on their rights.' This maxim 'constitutes a universal principle [which] may be used to weigh the merits of competing equities.'"); *see also Schurenberg v. Butler Cty. Bd. of Elections,* 605 N.E.2d 1330, 1334 (Ohio Ct. App. 1992). Thus, SIS's failure to conform its own contracts to the RIA undermines its allegations of harm.

that it can peddle to application providers, forcing Reynolds to operate under a set of rules to which it did not agree to advantage SIS would certainly be detrimental to Reynolds.

Additionally, SIS has breached the RIA by providing integration services via its eData Product to vendors not identified in the RIA. *See* Ex. 1 Ex. E, p. 18; Ex. A ¶¶ 20-21 (SIS has evidently been providing integration services to undisclosed vendors). Thus, Reynolds's harm is compounded by damages that stem from SIS's breach of its obligations—a breach that will continue as long as SIS is allowed to force its integration product on Reynolds beyond the term of the RIA. Similarly, Reynolds's ability to protect its rights has been further undermined by SIS's continued refusal to provide to Reynolds copies of the underlying contracts as required by the RIA. Ex. A ¶ 18; Ex. 1 Ex. E § I(1). Reynolds has repeatedly asked for copies of the agreements, and to date, SIS has refused to provide them—even though its allegation of harm is based upon the terms of these agreements. To make matters worse, over the last several weeks (even after SIS filed this lawsuit), SIS has embarked on a mission to sign up new End Users— presumably to extend its ability to market its integration product under its flawed interpretation of the RIA. Ex. A ¶ 19. These facts, without more, counsel against granting SIS the relief it seeks.

Reynolds will suffer substantial harm if SIS is successful in convincing the Court to extend the termination date of the RIA beyond that provided for in the Agreement. SIS has engaged in multiple, willful breaches of the RIA by both accessing and writing back data to the DMS on behalf of undisclosed, unapproved third-party application providers, Ex. A ¶¶ 20-21, and by refusing to disclose the identity and contractual terms applicable to its application providers and end users on which it bases the ***relief it seeks here***, *id.* at ¶ 18. Moreover, although SIS bases its allegation of harm on its assertion that dealers and other third parties will be harmed if the integration is broken, SIS itself has, to the extent there is any such harm, *created*

16

*the harm* by choosing to install new end users of its eData Product, at an accelerated pace, notwithstanding the imminent expiration of the RIA. *Id.* ¶ 19. Hence, SIS does not approach the Court with clean hands and has no right to injunctive relief in this matter.[14]

**D.   It Would Be Contrary to Public Policy to Continue the RIA Past Its Express Term**

SIS is correct that "[t]he public has a strong interest in enforcing *valid* contracts and discouraging unfair trade practices[.]" Mem. at 20 (emphasis added & internal quotations omitted). But the contract as rewritten by SIS is not valid. "[I]n addressing public policy arguments, courts must be mindful that freedom of contract is fundamental[.]" *Core Funding Group, LLC v. McDonald*, No. L-05-1291, 2006 WL 832833, at *10 (Ohio Ct. App. Mar. 31, 2006); *Handel's Enters., Inc. v. Wood*, No. 04 MA 238, 2005 WL 3536475, at *11 (Ohio Ct. App. Dec. 22, 2005). SIS and Reynolds, two sophisticated companies represented by in-house counsel, freely contracted for § V(g) *as written*. Public policy is better served by enforcing *that* contract. Moreover, "[i]t is still hornbook law that the freedom of contract entails the freedom *not* to contract[.]" *Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333 (6th Cir. 1997) (emphasis added). Indeed, the liberty to contract "is no right at all if it is not accompanied by freedom not to contract. The corollary is that, before one may secure redress in our courts because another has failed to honor a promise, *it must appear that the promisee assented to the obligation in question*." *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) (emphasis added). Because Reynolds never consented to the "wind-down" obligation SIS is asserting, it would violate public policy to grant injunctive relief and force Reynolds to extend the Agreement beyond its express term. *Cf.*

---

[14] Equity requires movants "shall have acted fairly and without fraud or deceit as to the controversy at issue." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (citations & quotations omitted); *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 126 (M.D. Pa. 1992) ("The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.").

*Bessinger v. Food Lion, Inc.*, 305 F. Supp. 2d 574, 582 (D.S.C. 2003) ("If the plaintiffs can force the defendants to continue in a business relationship, removing from them the freedom to terminate it, then the mutuality that has long defined business agreements has vanished.").

E.  **Reynolds Is Entitled to a Substantial Bond in the Event an Injunction Issues**

SIS has failed to meet its burden to obtain the injunctive relief requested. If the Court orders such relief, however, Reynolds respectfully requests that SIS be ordered to post bond to protect Reynolds against the significant risks of harm to Reynolds set forth above. Under Federal Rule of Civil Procedure 65(c), "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond." *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007); *Mead Johnson & Co. v. Abbot Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).

In order to protect Reynolds against the costs that it will incur if it must continue to provide its DMS services and substantial infrastructure to SIS—a party that has proven in this litigation it will continue to burden Reynolds so long as it is permitted—Reynolds requests that, as a bond against such injuries to Reynolds, SIS be ordered to deposit into the registry of the Court all fees that it earns from the provision of its integration product to any third-party application vendors or dealership end users who it contends must continue to have access to the eData Product through the RCI Gateway, and to deposit an amount reasonably necessary to

compensate Reynolds for its provision of services and infrastructure to support SIS's continued integration.

## V.   PRAYER

For all of these reasons, Reynolds respectfully requests that SIS's Motion be denied. In the alternative, if an injunction shall issue, Reynolds requests that the relief be of a determinate and limited duration and that SIS be ordered to deposit into the registry of the Court all fees from the provision of SIS's integration product through the RCI Gateway, and an amount reasonably necessary to compensate Reynolds for its provision of services and infrastructure to support SIS's continued integration.

Dated: September 21, 2009.

Respectfully submitted,

/s/James H. Greer
David C. Greer, Trial Attorney (0009090)
James H. Greer, Trial Attorney (0046555)
Bieser, Greer & Landis LLP
400 National City Center
6 North Main Street
Dayton, Ohio  45402-1908
Tel:  937.223.3277
Fax:  937.223.6339

GIBBS & BRUNS, L.L.P.
Grant J. Harvey, *pro hac*
Aundrea K. Frieden, *pro hac*
Angus J. Dodson, *pro hac*
1100 Louisiana, Suite 5300
Houston, Texas  77002
Tel:  713.650.8805
Fax:  713.750.0903

ATTORNEYS FOR DEFENDANT,
THE REYNOLDS AND REYNOLDS COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served on counsel for the Plaintiff Superior Integrated Systems, Inc., as identified below, by electronic mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) this 21st day of September, 2009.

| | |
|---|---|
| Keven Drummond Eiber<br>keiber@brouse.com<br>Anastasia J. Wade<br>awade@brouse.com<br>BROUSE MCDOWELL<br>1001 Lakeside Avenue, Suite 1600<br>Cleveland, Ohio 44114-1151<br>Tel: (216) 830-6816<br>Fax: (216) 830-6807 | Barry Buchman<br>buchmanb@gotofirm.com<br>Gilbert LLP<br>1100 New York Avenue, NW, Suite 700<br>Washington, DC 20005<br>Tel: (202) 772-2305<br>Fax: (202) 772-2307 |

/s/James H. Greer